Eastern District of Kentucky
F I L E D
AUG - 1 2014
AT COVINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

CIVIL ACTION NO. 2:12-cv-170(WOB-JGW)

EDWARD GODAWA, ET AL.                              PLAINTIFFS

VS.          MEMORNADUM OPINION AND ORDER

OFFICER DAVID BYRD                                  DEFENDANT

This is a 42 U.S.C. §1983 and state law action arising from the death of a young man, Michael Godawa, when he attempted to flee the scene of an arrest by assaulting a police officer with his vehicle. The officer in this case was forced to make a split-second judgment to protect his life and the lives of the public. The single shot that was fired by the officer within seconds of the vehicular assault was fatal, and this action ensued.

Plaintiffs allege a violation of the Fourth Amendment for use of excessive force, a violation of the Fourteenth Amendment due process clause, and state law claims of wrongful death and "intentional tort, battery and murder."[1]

This matter is now before the Court on Plaintiffs' motion for summary judgment (Doc. 47), Defendant's cross-motion for

---

[1] The Court construes the latter claim as a single claim of the intentional tort of battery.

summary judgment (Doc. 48), and Defendant's motion to strike the report and testimony of Plaintiffs' expert witness (Doc. 49).

The Court held oral argument on these motions on June 27, 2014. Christopher Roach was present for the Plaintiffs, and Jeffrey Mando, Philip Taliaferro, III, Ryan Turner, and Levi Daly were present for the Defendant. Defendant Officer Byrd and Chief of Police Tim Thames were also in attendance. Official court reporter, Joan Averdick, recorded the proceedings. Thereafter, the Court took the matter under advisement. Doc. 62, Order.

On July 1, 2014, the Court issued an order directing the parties to file supplemental briefs addressing the recent Supreme Court decision, *Plumhoff v. Rickard*, No. 12-1117, -- U.S. --, 134 S. Ct. 2012, -- L. Ed.2d --, 82 USLW 4394 (May 27, 2014) (Doc. 63).

Having heard from the parties, reviewed the parties' briefs and supplemental briefs, and being sufficiently advised, the Court hereby issues the following Memorandum Opinion and Order.

## Facts[2]

Michael Godawa (the "decedent") was a 21-year-old patron at the Finish Line Bar in Elsmere, Kentucky, on the evening of June 22, 2012 and early morning of June 23, 2012. Doc. 51-1, T. Godawa Depo., p. 33. At approximately 1:00 a.m., Officer David Byrd, a police officer for the city of Elsmere, was conducting his regular patrol. Doc. 26-1, Byrd Depo., p. 24. At the time, he was patrolling on a bicycle and was wearing his bike patrol police uniform. *Id.*

A Finish Line employee approached the officer and complained that a patron in the parking lot appeared to be drinking underage. Doc. 26-1, Byrd Depo., p. 25. The officer watched as the suspect decedent drove his car from the back of the parking lot to an open parking space closer to the front of Finish Line.[3] *Id.* at 26.

The officer approached the vehicle and asked the decedent if he had been drinking, and the decedent responded negatively. Doc. 26-1, Byrd Depo., pp. 27-28; Doc. 21-1, Lapel Video at 1:23:26-32. The officer asked for an explanation of the beer

---

[2] The parties agreed at the June 27, 2014 hearing to the evidentiary facts as stated herein. They are derived from the officer's lapel camera and the surveillance camera for the tavern's parking lot. *See Eggleston v. Short*, 560 Fed. App'x 561, 563 (6th Cir. 2014) (the defendant must agree to the plaintiff's version of the facts; otherwise an issue of fact is created, and qualified immunity must be denied). The conclusions to be drawn from the facts are, of course, disputed.

[3] As the officer started speaking with the decedent, he turned on his lapel camera, and the rest of the incident is therefore recorded. The lapel video has a timeclock readout, which enables the Court to precisely track the elapsed time for the critical events that follow.

bottle sitting in the cup holder of the car, to which the decedent responded that the beer belonged to his girlfriend, who was inside the bar. Doc. 26-1, Byrd Depo., p. 28; Doc. 21-1, Lapel Video at 1:23:33-1:24:33.

When the officer asked for the decedent's identification, the decedent responded that he was licensed, but did not have the license on him. Doc. 26-1, Byrd Depo., p. 27; Doc. 21-1, Lapel Video at 1:24:33-45. The officer then asked the decedent to submit to a field sobriety test. Doc. 21-1, Lapel Video at 1:24:51-1:25:03. The decedent responded that he was nervous and did not want to take the test. *Id.* at 1:25:03-1:25:09. The officer instructed the decedent to "hold on a second" while he went to the rear of the vehicle to retrieve a notepad and pen. *Id.* at 1:25:10-1:25:11. He then walked back to the decedent's side window and obtained the decedent's name and social security number. *Id.* at 1:25:26-1:25:48.

After returning to the vehicle, the officer again questioned whether the decedent had been drinking. *Id.* at 1:25:48-1:25:51; Doc. 26-1, Byrd Depo., p. 28. The decedent then admitted to lying to the officer and said he actually had "one or two" drinks and that the beer in the cup holder was not his girlfriend's. Doc. 26-1, Byrd Depo., p. 28; Doc. 21-1, Lapel Video at 1:25:51-1:26:25.

The decedent then told the officer he would submit to a field sobriety test. *Id.* at 1:26:32-1:27:21; Doc. 26-1, Byrd Depo., p. 30. The officer told the decedent to "hold on" and walked to the rear of the vehicle to request backup from dispatch. Doc. 21-1, Lapel Video at 1:27:21-43.

While the officer was still at his bicycle behind the vehicle speaking with dispatch, the decedent started his car and began backing out of his parking spot. Doc. 26-1, Byrd Depo., p. 30; Doc. 21-1, Lapel Video at 1:27:44-48. The decedent struck the officer's bicycle and nearly struck the officer in the process of backing up. Doc. 26-1, Byrd Depo., pp. 23, 30. As the decedent was backing up, the officer loudly yelled "hey" five times. Doc. 21-1, Lapel Video at 1:27:51-54.

As the decedent shifted the vehicle from reverse to drive, the officer ran to the front of the car with his gun drawn and ordered the decedent to stop the car. Doc. 26-1, Byrd Depo., p. 31; Doc. 21-1, Lapel Video at 1:27:55-58; Doc. 15-2, Finish Line Video at 1:19:11-13.[4] The officer commanded the decedent to "stop" four times. Doc. 21-1, Lapel Video at 1:27:55-58.

The decedent accelerated forward at a rate of five to ten miles per hour. Doc. 26-1, Byrd Depo., p. 32. The officer did not fire when the decedent began driving towards him. *Id.*

---

[4] The Finish Line surveillance video, which does not contain audio, displays a timeclock readout, the timing of which differs from the officer's lapel video.

-5-

The decedent continued to drive forward and struck the officer in the left leg around the knee, which knocked the officer onto the hood on the car. *Id.* at 33, 99; Doc. 21-1, Lapel Video at 1:27:58-59; Doc. 15-2, Finish Line Video, 1:19:13. The car traveled forward while the officer was on the hood of the car and his feet were off the ground. Doc. 26-1, Byrd Depo., p. 100. The impact of the officer and the vehicle cannot be clearly seen on the lapel camera video, but a loud crash can be heard. Doc. 21-1, Lapel Video, 1:27:58-59.

The officer came off the hood on the passenger side of the vehicle with his pistol drawn while the decedent drove toward the exit of the Finish Line parking lot. Doc. 26-1, Byrd Depo., p. 33; Doc. 21-1, Lapel Video at 1:27:58-1:28:00. Within seconds of landing on his feet, the officer fired a single shot from his already-drawn gun at the decedent through the passenger side of the car. Doc. 26-1, Byrd Depo., pp. 32-33. The shot cannot be heard on either the surveillance or lapel video, but it was fired within a four-second range. Doc. 21-1, Lapel Video at 1:27:58-1:28:02; Doc. 15-2, Finish Line Video at 1:19:11-15. The bullet entered the decedent's right shoulder, upper back area and lodged in his chest. Doc. 15-6, Autopsy Photos.

After he was shot, the decedent made a left-hand turn out of the parking lot and proceeded southbound on Dixie Highway. Doc. 26-1, Byrd Depo., p. 36; Doc. 21-1, Lapel Video at 1:28:02. The

officer radioed in what happened. Doc. 21-1, Lapel Video; Doc. 26-1, Byrd Depo., p. 36. Then, the decedent turned around in a parking lot and drove back towards the Finish Line where the officer was now standing in the middle of Dixie Highway. Doc. 26-1, Byrd Depo., pp. 36-37.

When the car came back towards the officer, the officer did not fire his gun because the car slowed down and the officer observed that the decedent was slumped over the steering wheel and appeared to be injured. *Id.* at 37. The officer again ordered the decedent to stop the vehicle, but the decedent accelerated northbound. *Id.* at 37-38.

The decedent struck a utility pole at the next intersection where two other responding officers arrived shortly after impact. *Id.* at 38-39. The officer returned to the Finish Line parking lot, picked up his bicycle, and joined the other officers at the decedent's car where the officers were waiting for paramedics to arrive. *Id.*, Doc. 21-1, Lapel Video.

Elsmere police and officers responded to the scene, followed by emergency medical technicians. Doc. 15-4, EMS Run Report.

The decedent died from exsanguination due to perforation of his right lung from the gunshot wound to his chest. Doc. 54-1, Hamilton County Coroner's Report.

Plaintiffs Edward and Tina Godawa, the decedent's parents, opened an estate for their son and filed this action on August 13, 2012. Doc. 1, Complaint. The Court granted Plaintiffs' motion for leave to file an amended complaint on December 27, 2012. Docs. 17-18, Order and Amended Complaint. On July 17, 2013, Plaintiffs filed a premature motion for summary judgment (Doc. 21), which the Court denied (Doc. 32). Discovery then ensued, and the motions now before the Court were fully briefed.

## Analysis

### 1. Qualified Immunity

"In order for [the defendant] to be held liable under §1983, it is the plaintiff's burden to show that [the defendant is] not entitled to the protection of qualified immunity." *Sheffey v. City of Covington*, --- Fed. App'x ---, No. 12-5109, 2014 WL 1663063, *4 (6th Cir. April 28, 2014). The Court determines qualified immunity by application of two factors: (1) whether the action violated a constitutional right; and (2) if so, whether that constitutional right was clearly established such that a reasonable officer would understand that what he is doing would violate that right. *Id.* (citing *Morrison v. Bd. Of Trs. Of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009)).

#### A. No Constitutional Violation

To prove that an officer's use of force was excessive in violation of the Fourth Amendment, the plaintiff must show that

the use of force was objectively unreasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 399, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). Determining the objective reasonableness of a particular seizure "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotations and citations omitted). The inquiry requires analyzing the totality of the circumstances. *Id.*

Reasonableness is analyzed "from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' We thus 'allo[w] for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.'" *Plumhoff v. Rickard*, -- U.S. --, 134 S. Ct. 2012, 2020, -- L. Ed. 2d --, 82 USLW 4394 (May 27, 2014) (citing *Graham*, 490 U.S. at 396-397). In assessing the reasonableness of a particular use of force, the courts pay special attention to "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

Consistent with Supreme Court and Sixth Circuit precedent, Officer Byrd did not violate the decedent's Fourth Amendment rights in this case.

The evidence establishes that the decedent, whom the officer suspected was intoxicated, backed his car over the officer's bicycle, nearly hitting the officer, and continued driving while ignoring the officer's drawn gun and repeated commands to stop. The decedent then drove into the officer, using the vehicle as a weapon to strike the officer and knock him up and over the hood of his car, and then continued his flight by driving forward. Within approximately four seconds of this vehicular assault, in what was clearly a split-second judgment, the officer fired a single shot at the decedent, and the driver continued to flee the scene. Doc. 21-1, Lapel Video, 1:27:58-1:28:02. The entire incident, from the time the decedent started his car to the time the decedent pulled his car out onto the busy highway, lasted only between fifteen and twenty seconds. *Id.* at 1:27:44-1:28:02.

The severity of the crime inquiry is one of totality of the circumstances, and, in this case, does not involve a minor or insignificant crime. Rather, at the time the fatal shot was fired, the officer had probable cause to believe the decedent committed a number of violent and serious offenses, including attempted murder, first-degree assault, wanton endangerment in

the first degree, and fleeing and evading in the first degree. *See Sheffey,* --- Fed. App'x ---, No. 12-5109, 2014 WL 1663063, *6 (6th Cir. April 28, 2014) (circumstances created a risk significantly more severe than usual in an investigation of a misdemeanor charge of carrying a concealed firearm without a permit); *see also Hocker v. Pikeville City Police Dep't,* 738 F.3d 150, 156 (6th Cir. 2013) (considering not only the misdemeanor that justified the stop but also the felonies the suspect incurred as a result of his flight from police).

The evidence also demonstrates the officer had reason to believe that both his life and the safety of the public at large were at risk. The officer fired within seconds of being struck by the decedent's car and when within feet of the still-moving vehicle; thus, the risk to the officer had not subsided at the time the officer fired the shot. *See* Doc. 26-1, Byrd Depo., pp. 7, 33. Rather, as in *Hocker,* the officer had a reasonable basis for assuming the decedent was not finished using his car as a weapon at the time he fired his shot. 738 F.3d at 156; *see Williams v. City of Grosse Pointe Park,* 496 F.3d 482, 487-488 (6th Cir. 2007) (approving an officer's use of deadly force immediately following a vehicular assault occurring during a suspect's attempt to flee).

In addition, the record demonstrates that the decedent posed a threat to the public at large. The decedent's flight

occurred in a bar parking lot during business hours. The surveillance video confirms that at least four people were standing near the bar entrance in close proximity to the decedent's vehicle in the two minutes before the flight began. Doc. 15-2, Finish Line Video, 1:17:30-1:19:12. The decedent was attempting to flee onto a busy U.S. Highway, where he continued to pose a serious risk of harm to the motoring public. *See Plumhoff v. Rickard*, No. 12-1117, -- U.S. --, 134 S. Ct. 2012, 2022, -- L. Ed.2d --, 82 USLW 4394 (May 27, 2014) (firing fifteen shots at a fleeing suspect was reasonable where the suspect posed a grave risk to public safety after engaging in a high speed chase and colliding with a police car); *Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (police officer's attempt to terminate a dangerous high-speed car chase that threatened the lives of innocent bystanders did not violate the Fourth Amendment, even when it placed the fleeing motorist at risk of serious injury or death); *Williams*, 496 F.3d at 487 (use of force reasonable where the suspect knocked a sergeant to the ground, putting him in immediate danger, and the attempt to escape posed a threat to anyone within the vicinity).

Lastly, it is undisputed that the decedent was actively resisting arrest when the officer used deadly force. Doc. 54, Pl. Response Brief, p. 15. The decedent's conduct made it clear

he was evading the officer's exercise of police authority by fleeing an arrest. *See Williams*, 496 F.3d at 487. The decedent ignored nine commands to stop, struck the police officer's bicycle and nearly hit the officer, and then struck the police officer with total disregard for his authority and safety.

Thus, weighing all of the *Graham* factors, and considering the situation without the benefit of 20/20 hindsight, the officer's use of force was objectively reasonable. Plaintiffs have failed to prove that the Defendant violated the decedent's right to be free from excessive force.

### B. No Violation of a Clearly Established Right

Even if the officer had used excessive force in violation of the Fourth Amendment, he is entitled to qualified immunity. For the sake of completeness, the Court will assume *arguendo* that the officer used excessive force in violation of the decedent's Fourth Amendment rights sufficient to advance to the qualified immunity analysis.

The officer cannot be said to have violated the decedent's clearly established right "unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 134 S. Ct. at 2023 (citing *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083-2084, 179 L. Ed. 2d 1149 (2011)). Thus, "'existing precedent must have placed the statutory or

constitutional question' confronted by the official 'beyond debate.'" *Id.* In addition, the law must be sufficiently specific to the facts alleged and not defined at a "high level of generality" as "doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* (citing *Ashcroft*, 131 S. Ct. at 2074).

Plaintiffs are unable to meet their burden to show that the officer was not entitled to use deadly force, because as of June 23, 2012, there was no binding precedent that precluded an officer's use of deadly force following a physical assault on the officer while the suspect is actively fleeing from arrest.

Rather, relevant authority establishes that use of such force was justified. In *Plumhoff,* the Supreme Court determined that, in an analogous circumstance, the officer was entitled to qualified immunity for his use of force. 134 S. Ct. at 2024.

In *Plumhoff*, a fleeing suspect and his passenger led officers on a high-speed car chase that came to a temporary halt when the suspect spun out in a parking lot and made contact with the officers' cruiser. *Id.* at 2017. The suspect maneuvered his car and continued to use the accelerator even though his bumper was flush against a patrol car. *Id.* An officer fired three shots into the car and the driver drove away, almost hitting an officer in the process. *Id.* Officers then fired twelve more

shots as the driver sped away, striking him and his passenger, both of whom died. *Id.* at 2018. The Court found that the officers did not violate clearly established law in ending the chase with deadly force. *Id.* at 2022.

Similarly, in *Brousseau v. Haugen*, 543 U.S. 194, 197, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004), cited as controlling authority by the *Plumhoff* Court, an officer did not violate clearly established law when she fired at a fleeing vehicle to prevent possible harm to other officers on foot in the immediate area, occupied vehicles in the suspect's path, and other citizens in the area.

Plaintiffs have failed to meaningfully distinguish *Plumhoff* and *Brosseau* from the facts of this case. In the view of this Court, *Plumhoff* controls the result of this case. *Plumhoff* held that, as of July 18, 2004, an officer was entitled to qualified immunity from an excessive force claim where he fired his pistol into a car, the driver of which was attempting to escape from a parking lot onto a public highway. 134 S. Ct. at 2024. The following statement by the Supreme Court is particularly relevant:

> Thus, the record conclusively disproves respondent's claim that the chase in the present case was already over when petitioners began shooting. Under the circumstances at the moment when the shots were fired, all that a reasonable police officer could have concluded was that Rickard was intent on resuming his flight and that, if he was allowed to do so, he would

> once again pose a deadly threat for others on the road. Rickard's conduct even after the shots were fired – as noted, he managed to drive away despite the efforts of the police to block his path – underscores the point.

*Id.* at 2021-2022.

Although Plaintiffs have attempted to distinguish *Plumhoff* by pointing out that the shooting there followed a 100-mile-per-hour chase on the highway, the fatal shooting actually took place in a parking lot when the subject car was at a standstill. *Id.* at 2021. If it was the law in 2004 that excessive force was justified to protect the public in such circumstances, it could not have been obvious to Officer Byrd that what he did here would violate Godawa's constitutional rights. In fact, the contrary is the more likely conclusion.

### 2. Fourteenth Amendment Due Process Claim

Summary judgment in favor of the officer on the Plaintiffs' Fourteenth Amendment due process claim is also appropriate. Plaintiffs' allegation that the decedent's due process rights were violated is a reiteration of their Fourth Amendment claim. Claims for excessive use of force upon arrestees must be pursued and analyzed only under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (holding that "*all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen

should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."). Thus, summary judgment in favor of the officer on Plaintiffs' due process claim is appropriate.

### 3. Plaintiff's Remaining State Law Claims

Plaintiffs concede they are unable to bring a loss of consortium claim for their son, who was twenty-one at the time of death. Doc. 54, Response to Defendant's Motion for Summary Judgment, p. 1. This type of claim is limited to "minor" children under the express language of KRS §411.135. *See Combs v. Comair, Inc.*, 556 F. Supp. 2d 665, 673 (E.D. Ky. 2008). Summary judgment for the officer on this claim is therefore appropriate.

The Court declines to exercise its supplemental jurisdiction over Plaintiffs' remaining state law claims, since the law of state immunity differs from that of federal immunity. *See* 28 U.S.C. §1367.

### 4. Defendant's Motion to Strike the Report and Testimony of Spicer

Defendant's motion to strike the report and testimony of proffered expert, J. Scott Spicer, and prevent him from testifying at trial is moot.

Therefore, the Court having heard from the parties, and being sufficiently advised,

**IT IS ORDERED:**

(1) Plaintiffs' motion for summary judgment (Doc. 47) be, and hereby is, **DENIED**;

(2) Defendant's motion for summary judgment (Doc. 48) be, and hereby is, **GRANTED in part and DENIED in part**. The motion is **GRANTED** as to Plaintiffs' federal claims and state law loss of consortium claim. The motion is **GRANTED** as to Plaintiffs' remaining state law claims, but these claims are **dismissed without prejudice**.

(3) Defendant's motion to strike the expert's report and testimony and preclude his trial testimony (Doc. 49) is **DENIED AS MOOT**; and

(4) A separate judgment will enter concurrently herewith.

This 1st day of August, 2014.

*William O. Bertelsman*

The Honorable William O. Bertelsman

United States District Judge